THE WHITE STAR MINING COMPANY OF ILLINOIS

*v.*

NELS O. HULTBERG *et al.*

*Opinion filed April 17, 1906.*

1. APPEALS AND ERRORS—*when party in possession of a mining claim has a freehold estate.* If the party in possession of a mining claim has complied with the laws of the United States with reference to the acquisition of the claim he has a freehold estate, notwithstanding the naked legal title remains in the United States because of his failure to take out the patent to which he is entitled.

2. SAME—*freehold involved may be located in a foreign State.* While a court of equity in Illinois cannot bind the land itself in decreeing specific performance of a contract respecting a freehold located in a foreign State, yet if it has jurisdiction of all the parties by personal service it may enforce its decree *in personam,* and a freehold will be regarded as involved on appeal from the decree.

3. ARBITRATION AND AWARD—*when signature to articles of arbitration is binding on corporation.* Articles of submission to arbitration, executed by the president of the corporation in its name and with the seal of the corporation, are binding upon the corporation, where the latter appeared by attorney before the arbitrators and participated in the hearing.

4. SAME—*rule where award is in conformity with general submission.* Where an award is in conformity with the general submission and no fraud or mistake appears on the face of the award, it will not be interfered with or set aside by a court of equity for errors, either of law or fact, committed by arbitrators.

5. SAME—*when submission to arbitration is not special.* The fact that articles of submission expressly provide that the decision of the arbitrators shall be based upon competent evidence only, and shall be according to established principles of law and equity, does not render the submission special, so as to justify a court of equity in setting aside the award for errors of law, where there is no provision for a review of the case by the courts or that the legal questions should be referred to some tribunal other than the arbitrators for decision. (HAND, J., and CARTWRIGHT, C. J., dissenting.)

6. SAME—*impeaching facts must appear on face of an award to justify court's interference.* Where it appears from an award that the arbitrators base their decision upon certain rules of law or upon a finding of certain facts, and it is clearly apparent that they misapprehended the law or the facts, a court of equity, *if the facts*

*appear upon the face of the award itself,* may set the award aside or reform it on the ground of mistake.

7. SAME—*separate statement of an arbitrator cannot be considered to impeach award.* The opinion of the arbitrators which binds the parties is that expressed in the award, and a separate statement or opinion of one of the arbitrators cannot be considered by the courts in determining whether the arbitrators mistook or misunderstood the law.

APPEAL from the Circuit Court of Cook county; the Hon. F. A. SMITH, Judge, presiding.

HEALY & CAYLOR, for appellant and for appellee Claes W. Johnson.

OLAF E. RAY, for appellee Peter H. Anderson.

WINSTON, PAYNE & STRAWN, and HARRIS F. WILLIAMS, for appellees Nels O. Hultberg and the Swedish Evangelical Mission Covenant.

Mr. JUSTICE WILKIN delivered the opinion of the court:

This is a direct appeal from an order of the circuit court of Cook county dismissing the bill of appellant to set aside an award of arbitrators theretofore rendered between it and certain of the appellees, and decreeing the performance of the same award on the prior bill of Nels O. Hultberg.

The following facts appear from the pleadings and evidence in the record: The Swedish Evangelical Mission Covenant of America was organized as a corporation not for pecuniary profit, under the laws of the State of Illinois, in 1885. The purposes of its organization were, to carry on christian mission work in the United States and foreign countries, spread the gospel and promote a christian association and religious life between the church congregations and members thereof, and to do general christian, charitable and educational work. In 1887 it placed one Alex Edward

Carlson in charge of a missionary station at Unalaklik, in Alaska, which had been turned over to it by the Swedish Evangelical Mission Covenant of Sweden, and in 1893 it established an additional station at Chinik, in that territory, and placed in charge of it Nels O. Hultberg, one of the appellees. In the summer of 1897 Peter H. Anderson, another one of the appellees, arrived at Chinik, where he had been sent by the covenant at its expense to perform the duties of a missionary teacher. He had previously been educated by the covenant at one of its colleges, partly at his own expense and partly at the expense of the covenant. At the time of this assignment he was wholly without other means than clothing and personal effects, all of which had been furnished him by the covenant for the purpose of fitting him out for his journey and his work at said missionary station. From the time of his arrival at Chinik until August 31, 1898, when Hultberg, with his wife, started on a trip to the United States and Sweden, he (Anderson) and Hultberg co-operated together in carrying on the work of the covenant, Hultberg being in general charge and Anderson doing the work of a teacher. Neither of these men received any salary for his work, but the covenant supplied them with provisions of the value of about $1700 per year for themselves and about $300 worth for the native Eskimos, and in addition they received certain profits which were derived from reindeer kept at the station. During the spring of 1898 Hultberg made a number of prospecting trips in various directions from Chinik in search of gold, and he and Anderson located claims in their individual names on Melsing and Ophir creeks, one in the name of each on each of said creeks. Another expedition was made in July, 1898, to Anvil creek, in the Cape Nome mining and recording district, on which no claims were taken or located but arrangements were made for future explorations, and in September of that year thirteen claims were staked out by them in the names of various parties, one of which, known as "No. 9 Above," being taken in the names

of Gabriel and Constantine, two Eskimo boys, who were then under twenty-one years of age and had been connected with the covenant station for a number of years prior to that time. It was and is claimed on behalf of the covenant that said No. 9 Above was located and taken in the names of the boys Gabriel and Constantine for it. Upon the return of this expedition to Chinik a question arose as to whether the claim had been established according to law and as to the right of the Eskimo boys to hold the same, and in order to remedy that possible defect another expedition was sent out the following October, and claim No. 9 Above, the boundaries of which were different from those of the first location, was taken in the name of a man by the name of Price. It was taken in his name, however, merely for the purpose of enabling Anderson to obtain title to it in his own name for the supposed benefit of the covenant, and Price subsequently conveyed the claim to Anderson for a stated consideration of $20, which amount, it is claimed, was never paid. Early in 1899 Anderson went upon the property and commenced the work of preparing for mining gold. In June of that year Hultberg returned to Alaska from his visit to the United States and Sweden, and shortly afterwards, as he testified, Anderson informed him, in substance, that claim No. 9 had been staked and located for the covenant and that it belonged to the covenant. The evidence also tends to show that Anderson made the same admission to other parties, and that the claim continued to be held in that way until it became manifest that it was very rich in gold, when Anderson asserted its exclusive ownership in himself, individually. From this claim and other interests Anderson has amassed a fortune amounting to about $440,000, all of which he has appropriated to his own exclusive use, except some $95,000 which he gave to the covenant, $500 to the Eskimo boys Gabriel and Constantine, and $15,000 paid to settle certain litigation in which the covenant was involved. It was claimed by appellees that at the time said property was taken posses-

sion of, Anderson was in the employ of the covenant; that the claim was staked out for the benefit of the covenant, and that he used the supplies which were furnished him by the covenant for the purpose of stocking the various expeditions which went out to establish those claims.

When Anderson began to use the property as his own, a controversy arose between him and the covenant as to its ownership, and on February 7, 1901, Anderson wrote a letter to the committee of the covenant in which he agreed to donate $25,000 to the covenant school, $4000 to the covenant for students of theology and $25,000 to found a hospital in Lake View, Cook county, this State, provided the covenant should not bring suit against him to regain claim No. 9. On August 16, 1901, the president and secretary of the covenant executed, in their names and on behalf of the covenant and under its seal, a release, which purported, in consideration of the sum of one dollar paid by Anderson to the covenant, to release and discharge him from all possible liabilities on claim No. 9, and subsequently the donations above mentioned were paid to the covenant and used by it in its work. The execution of this release was reported to the executive committee of the covenant subsequently to its next general conference, and the acceptance of the donations was by it approved.

In May, 1902, there was organized under the laws of the State of California a corporation known as the White Star Mining Company of California, with a capital stock of 500,000 shares, of which Anderson owned 499,997, and to this corporation he conveyed claim No. 9 Above on Anvil creek, together with claim No. 2 Above on Anvil creek, and certain other mining claims which he had in the meantime acquired in Alaska. In January, 1903, he transferred the stock of the White Star Mining Company of California to the appellee Claes W. Johnson for a stated consideration of $100,000, and at the same time entered into a written contract with Johnson to the effect that this $100,000, which

was in payment of not only claim No. 9 Above but other mining interests, should be paid for out of the income of the mines after deducting the operating expenses, including $5000 which was to be allowed to Johnson for his personal use and for managing expenses.   This transfer also included the stock of Anderson in the White Star Mining Company.   In May, 1903, Johnson organized under the laws of the State of Illinois the White Star Mining Company of Illinois, the appellant, with a capital stock of $25,000, and to this corporation Johnson caused the White Star Mining Company of California to convey claim No. 9 Above and other mining properties, and during the year 1903 the White Star Mining Company of Illinois operated claim No. 9 at a net profit of $75,000.

Notwithstanding the execution of the release to Anderson by the president and secretary of the covenant, the question of the ownership of the mine No. 9 Above and the right of the covenant to the proceeds of it still continued to be a matter of discussion among the members of the covenant and its missionaries in Alaska, the claim being that said release was without authority of law and void.   A number of conferences and discussions took place between the covenant, Johnson and Anderson, which resulted in a transfer by the covenant to Hultberg of all rights of the covenant in the premises, and on June 17, 1903, a quit-claim deed was executed by it to Hultberg.   On September 8, 1903, an assignment was also executed by the covenant to Hultberg of its claim against Anderson, Johnson and the White Star Mining Company on account of gold taken out of the mine prior to the conveyances.   Hultberg made demands upon Johnson and the White Star Mining Company for possession of claim No. 9 Above and for an accounting for its proceeds, and on August 12, 1903, an agreement to submit all of said matters in controversy to arbitration was entered into, as follows:

"This agreement of special submission to arbitration, made and entered into this 12th day of August, A. D. 1903,

at Nome, Alaska, by and between Nels O. Hultberg, of Campbell, California, acting for and on behalf of himself and as successor in title and representing the interest of the Swedish Evangelical Mission Covenant of America, Claes W. Johnson, of Chicago, Illinois, the White Star Mining Company, a corporation organized and existing under the laws of the State of Illinois, and if they shall join herein as hereby provided for, then also the White Star Mining Company, a corporation organized and existing under the laws of the State of California, and Peter H. Anderson, of Chicago, Illinois:

"*Witnesseth*, that the said parties, or such of them as sign this agreement, mutually agree to submit, and do hereby submit, all their matters in difference, of every name and nature, pertaining to the title and the proceeds of that certain placer mine and mining claim known as and called 'No. 9 Above,' on Anvil creek, situate in the Cape Nome mining and recording district in the District of Alaska, to the award and decision of three arbitrators, or any two of them, to be selected as hereinafter provided, for them to hear and determine the same and make their award in writing on or before the 30th day of March next.    *    *    *

"Whereas, controversies are now existing and pending between the said Nels O. Hultberg, as successor and representative, as aforesaid, on the one part, and Claes W. Johnson, and the White Star Mining Company of Illinois, and the White Star Mining Company of California, and the said Peter H. Anderson, in relation to the mining claim and mine above described, and the proceeds thereof; and whereas, the said White Star Mining Company of Illinois and the said Johnson are now in possession of, operating and claiming to own said placer mining claim and to be entitled to the proceeds thereof, and have been so in possession and claiming to own the same for some time past, the said White Star Mining Company, a corporation of Illinois, claiming to have obtained title thereto from the said White Star Mining Com-

pany of California; and whereas, the said Nels O. Hultberg claims and asserts that he is the lawful owner of said mining claim and the proceeds thereof, and did, on the 11th day of August, 1903, cause to be served upon the White Star Mining Company of Illinois, of which the said Claes W. Johnson is president, a notice in writing of his claim of ownership, and of a demand for the possession of said mining claim and the proceeds thereof; and whereas, the said parties deem it wise and for the best interest of all concerned that the said claims and demands of the said Nels O. Hultberg and of the said other parties, respectively, shall be heard, determined and adjudicated upon by a submission of the said matters in controversy to the arbitrament of three arbitrators, to be selected as hereinafter stated, the decision of whom, or a majority of whom, upon said matters, after the hearing of evidence produced by the parties, shall be binding and conclusive upon the parties hereto; and whereas, also, the said Peter H. Anderson has heretofore claimed to own said mining claim and the proceeds thereof, and under said claims has had and received large amounts of gold and large sums of money as the income of said placer mine and mining claim; and whereas, the said White Star Mining Company of California has also for some period claimed to own and prior to April 1, 1903, been in possession of said mine and mining claim, and has received and appropriated to its own use proceeds, to-wit, gold and money, realized therefrom to a large amount; and whereas, said Hultberg claims and contends that he is entitled to the possession of said mine and to an accounting for the rents, issues and profits thereof against all of said parties who have been in possession thereof:

"Now, therefore, it is hereby agreed and understood by and between the parties hereto who shall execute this agreement, that the said claims and demands of the said Nels O. Hultberg, and also all contentions and defenses of the said other parties, shall be made and presented to the said three arbitrators to be selected as hereinafter specified, who shall

sit, hear and determine upon such claims and demands and contentions of the respective parties in the city of Chicago, State of Illinois, at such place therein as said arbitrators may decide, and the award to be made by said arbitrators, or any two of them who may agree, shall in all things by the parties hereto who shall execute this agreement be well and faithfully kept and observed: *Provided, however,* that the said award be made in writing under the hands of the said arbitrators, or any two of them, and ready to be delivered to the said parties in difference who have executed this agreement, or such of them as shall desire same, on or before the 30th day of March, 1904.

"It is further agreed and understood that said arbitrators shall be the judges of the admissibility of evidence before them in reference to said matters in controversy, and shall be liberal, and not technical, in the admission of evidence, and shall administer, or cause to be administered, oaths to the witnesses who may testify before them, but their conclusions shall be based upon legal and competent evidence only. Evidence that may be relevant and have a bearing on said matters in controversy which shall be presented by way of oral testimony of witnesses that may appear before said arbitrators, or by way of depositions taken upon notice waived or served for such length of time as may be required by the arbitrators, they shall admit and receive, but only in the presence of the parties or their legal representatives, unless the parties or their legal representatives shall voluntarily absent themselves from the sessions, or any session, of said arbitrators. And the said arbitrators, or any two of them, shall to the best of their ability hear, determine and adjudicate upon all such matters in controversy upon broad principles of equity and justice, having due regard as well for the moral as the legal rights of said parties and the law of the land. The arbitrators shall also give to all parties hereto the full benefit and advantage of all rights under the laws of any State, or of the District of Alaska, which might have

been availed of in any prosecution or defense in any court, and particularly shall full benefit and advantage be given to any defense which might have been made in any suit or legal proceedings which might or could have been instituted by said Hultberg or said covenant, whether consisting of matters of law or fact; and any such last mentioned defense which shall be sustained by evidence or authority of statutory or common law shall be deemed a sufficient defense by the abitrators, the same as it would have been if presented in any regularly constituted court of justice. In the event said arbitrators, or any two of them, shall find in favor of said Hultberg, they shall, as the evidence and the facts and the law may warrant, award damages or recovery of said land and premises, or both; and in the event that said arbitrators, or any two of them, shall find that said Hultberg is entitled to an accounting for the proceeds of said mine, as hereinbefore stated, they shall require such account and in their award state the result thereof. The said arbitrators, or any two of them, shall be the exclusive judges of the procedure to be adopted in the investigation before them, except as herein stated.

"It is undersood and agreed that the object of the parties hereto, in submitting this matter to arbitration, is, that there shall be a full, complete and just determination between said parties of all matters in controversy embraced herein, regardless of all technicalities, and that said adjudication shall be had upon the true merits of said controversy and according to law. * * * (Then follow provisions for the selection of the arbitrators and the manner in which they shall proceed to hear the case.)

"The parties hereto may appear by themselves and by attorney before the said arbitrators, and after the said arbitrators have closed the hearing of evidence and heard the arguments herein, they shall, after full consideration of the law and evidence, prepare their decision in writing within the time hereinabove stated, first, upon the claims and de-

mands of said Hultberg, so far as the White Star Mining Company of Illinois and Claes W. Johnson are concerned; secondly, upon such claims against Peter H. Anderson and the White Star Mining Company of California, if the said Anderson and the White Star Mining Company of California shall submit to this arbitration as hereinbefore stated. Such decision shall be definite, full and specific, so that if it shall be in favor of said Hultberg it shall describe the property to which he is found to be entitled, and shall specify the amount, if any, which he shall be paid by any of the parties, the White Star Mining Company of Illinois, Claes W. Johnson, Peter H. Anderson and the White Star Mining Company of California, jointly or severally, as the case may be; and such decision, when made and carried out, as hereinbefore stated, shall be for the purpose of finally ending, compromising and absolutely determining all of said differences and controversies and demands whatsoever had, made, arising or accruing, or which at any time or times may be had by or between said parties, for or by reason or means of said mine, mining claim or the proceeds thereof, or any matter or thing relating thereto or resulting therefrom. And the said Nels O. Hultberg, and the said White Star Mining Company of Illinois, and the said Peter H. Anderson, and the said White Star Mining Company of California, if they shall join herein, hereby agree to abide by, carry out and perform any decision and determination arrived at by the said arbitrators or a majority of them, and all the parties executing this agreement, and who join herein, hereby appoint the said arbitrators, or such of them as may act hereunder, as their agents, respectively, for them and in their behalf to settle finally and conclusively all said claims and demands made by the said Nels O. Hultberg as hereinbefore set forth, and hereby agree to be bound by the acts of their agents in this behalf. * * * (It is then stipulated that each party shall deposit with the arbitrators $500 to defray the expenses of arbitration and for the payment of the costs thereof, etc.)

"The said White Star Mining Company of Illinois for itself, and the said Nels O. Hultberg for himself, and all parties hereto and who may join herein for himself, each for itself and himself, hereby irrevocably authorizes and empowers and appoints any attorney at law in the State of Illinois its and his attorney, for it and for him to appear in any court of record, in term time or vacation, and confess and consent to the entry of a judgment or decree upon and in accordance with the decision and determination of the said arbitrators, or any two of them, or such of them as may act. And the said White Star Mining Company of Illinois, and Nels O. Hultberg, and any other party that may join herein, hereby expressly waive and release any and all errors or defects that may intervene in any proceeding; and such judgment or decree shall also be effective, binding and conclusive upon any of said parties who may consent to join herein or participate in this arbitration, and all parties so joining herein shall be considered to have joined in the appointment of any such attorney and to consent to his appearance or confession of said judgment or decree.

"It is further expressly understood and agreed by and between the parties hereto, that if either of the parties shall neglect or refuse to appoint an arbitrator who shall participate in this arbitration, as herein provided, then the party so failing, neglecting or refusing shall pay to the other party the sum of $1000 as liquidated damages for so failing, neglecting or refusing. The said amount as damages is hereby fixed at said sum in view of the fact that any loss or damage to the other party is difficult, if not impossible, of exact ascertainment. The party failing, neglecting or refusing, as aforesaid, hereby promises to pay such sum to the party that may appear with an arbitrator, immediately upon such failure, neglect or refusal, and the same shall be recoverable in any action by such one of the said Nels O. Hultberg, or the said mining companies, Johnson and Anderson as may not so fail, neglect or refuse.

"It is further agreed and understood beween the said Claes W. Johnson and the White Star Mining Company of Illinois and the other parties hereto, that until the arbitration shall have been had as herein provided, or said Hultberg shall fail, neglect or refuse to appoint an arbitrator, or until this agreement shall have expired, the said Johnson and the said White Star Mining Company of Illinois shall not encumber or dispose of the said mine and mining property.

"It is further agreed and understood that said Johnson and the White Star Mining Company of Illinois shall at all events be entitled to have and receive from the output of said mine during the year of 1903 a sufficient amount of gold or moneys to pay and defray all their operating expenses of said mine and mining claim, including labor and material purchased therefor during said time, and the further sum of $9000 shall be had and received by the said Johnson out of said output for his personal services; but all the output of said mine or mining claim, and the gold extracted therefrom during the mining season of 1903, except as hereinbefore stated, shall, in the event that said Hultberg should prevail in his claims and demands against said White Star Mining Company of Illinois, and if the decision of the arbitrators in that behalf should be in favor of said Hultberg, be accounted for by said White Star Mining Company of Illinois and by the said Claes W. Johnson and turned over to the said Hultberg immediately after such decision; and all output of product of said mining claim from and after the date hereof, except deductions allowed as aforesaid, shall, in the event said Hultberg shall prevail and obtain a decision therefor in his favor, be held and considered as a trust fund or trust property held by said Johnson as the agent of and in trust for said Nels O. Hultberg, and be accounted for and turned over to the said Hultberg accordingly. * * *

"This agreement shall extend to and be binding and obligatory upon the heirs, executors or administrators of the parties hereto.

"In witness whereof the said parties who are to be bound by this agreement have hereunto set their hands and seals and have executed this agreement in triplicate.

NELS O. HULTBERG,      (Seal.)
CLAES W. JOHNSON,      (Seal.)
P. H. ANDERSON,        (Seal.)
WHITE STAR MINING COMPANY
OF ILLINOIS,
By Claes W. Johnson, its President.
WHITE STAR MINING COMPANY
OF CALIFORNIA,
By ————————, its President.

[Seal of White Star Mining Co.]

"Signed, sealed and delivered in the presence of

AXEL CHYTRAUS,
N. SODERBERG."

David F. Lane of California and Abram M. Pence of Chicago were selected by the parties as two of the arbitrators, and they chose Hiram T. Gilbert, also of Chicago, as the third. On April 13, 1904, Lane and Gilbert made an award as follows, Pence refusing to join them:

"To all to whom these presents shall come or may concern, be it known and published that whereas, to us, Hiram T. Gilbert and David F. Lane, and also to A. M. Pence, as arbitrators, at Chicago, Illinois, were submitted by a certain arbitration agreement in writing, dated August 12, 1903, and signed and sealed by the parties thereto within the time therein specified, the matters in controversy mentioned in said agreement existing and pending between Nels O. Hultberg, of Campbell, California, acting for and on behalf of himself and as successor in title and representing the interest of the Swedish Evangelical Mission Covenant of America, Claes W. Johnson, of Chicago, Illinois, White Star Mining Company, a corporation existing under the laws of the State of Illinois, and Peter H. Anderson, of Chicago, Illinois, in relation to all their matters in difference, of every name and nature, pertaining to the title and the proceeds of that certain placer mine and mining claim known as and called 'No. 9 Above, on Anvil creek,' situated in the Cape

Nome mining and recording district, in the District of Alaska, in and by which said arbitration agreement it was provided, among other things, that the award of the arbitrators under said agreement be made in writing under the hands of the said arbitrators under said agreement, or any two of them, and ready to be delivered to the parties in difference under said agreement, or such of them as should desire same, on or before the 30th day of March, 1904. * * *

"Now, therefore, we, the said arbitrators, Hiram T. Gilbert and David F. Lane, having, together with said A. M. Pence, been duly selected as such arbitrators under said agreement and within the time specified in said agreement, do declare and publish that we, the said Hiram T. Gilbert and said David F. Lane, and also the said A. M. Pence, as arbitrators as aforesaid, appointed a time and place for the hearing of the matters in controversy under said agreement at Chicago, Illinois; that we and the said A. M. Pence, as arbitrators as aforesaid, gave due notice of such time and place to the respective parties to said agreement, and that said arbitrators were attended by all of the said parties and their respective counsel at the said hearing and each and every adjournment thereof, and that before the taking of any testimony by the said arbitrators, and at the first hearing on the 20th day of February, 1904, the oath of said arbitrators was waived by all of the said parties to said agreement; and further, we, the said Hiram T. Gilbert and David F. Lane, two of the said arbitrators, we, together with the said A. M. Pence, having heard the evidence, both oral and documentary, of the respective parties, and having examined all the matters in controversy under said arbitration agreement, each and all of said arbitrators having been present at each and every hearing and having heard all the evidence adduced by the respective parties, and having heard the arguments of counsel for the respective parties and being fully advised in the premises, each and all of said arbitrators having joined in the deliberations upon the matters in issue under the said

agreement and having proceeded in all respects in accordance with the terms of said agreement, do further hereby make and publish this our award in writing:

"*First*—With respect to the claims and demands of said Nels O. Hultberg, so far as the White Star Mining Company of Illinois and Claes W. Johnson are concerned, we decide that said Nels O. Hultberg is the owner of that certain placer mine and mining claim mentioned in said agreement, known as and called 'No. 9 Above, on Anvil creek,' situate in the Cape Nome mining and recording district, in the District of Alaska, and we award to him, said Nels O. Hultberg, the said placer mine and mining claim, and direct the said White Star Mining Company of Illinois to forthwith convey and deliver possession thereof to said Nels O. Hultberg; and we further decide that the output of said placer mine and mining claim, and the gold extracted therefrom during the mining season of 1903, after deducting therefrom a sufficient amount of gold or moneys to pay and defray all the expenses of said White Star Mining Company of Illinois and said Claes W. Johnson in operating said mine and mining claim, including labor and material purchased therefor during said time, and also after deducting therefrom the further sum of $9000, which said last mentioned sum is to be had and received by said Johnson out of said output for his personal services, which said output, after making the deductions aforesaid, is the sum of $26,000, belongs to said Nels O. Hultberg, and we award said sum to him, the same to be accounted for by said White Star Mining Company of Illinois and by said Claes W. Johnson and turned over by them to said Nels O. Hultberg immediately.

"*Second*—With respect to the claims of said Nels O. Hultberg against said Peter H. Anderson, we decide that said Nels O. Hultberg is entitled to recover from said Peter H. Anderson the sum of $232,200, and we award said sum to said Nels O. Hultberg, to be paid to him immediately by said Peter H. Anderson.

220—38

"*Third*—We award to the said Nels O. Hultberg the sum of $250 to be paid by said White Star Mining Company of Illinois and Claes W. Johnson jointly, and the further sum of $250 to be paid by said Peter H. Anderson, as his statutory costs and expenditures incurred by him in and about said arbitration, the said sums, amounting in all to $500, being agreed upon as correct and just by the said parties, and all other costs and expenses of said arbitration having by the agreement of the parties been paid out of moneys furnished said arbitrators for that purpose by said White Star Mining Company of Illinois, Claes W. Johnson and Peter H. Anderson, the amount so paid and furnished by said White Star Mining Company of Illinois and said Johnson being $1436.25 and the amount so paid by said Peter H. Anderson being $3750.

"We make the foregoing award as a full and complete decision and determination of all the matters of difference between the said parties submitted to us by said agreement of special submission to arbitration.

"Witness our hands and seals this 13th day of April, A. D. 1904.    Hiram T. Gilbert,    [seal],
                                 David F. Lane.     [seal]"

On April 15, 1904, Hultberg filed a bill in the circuit court of Cook county for the purpose of having judgment entered upon the award, as provided by statute. The day following, the White Star Mining Company, Johnson and Anderson entered their appearance in that suit and moved the court to vacate, set aside and annul the award; and the White Star Mining Company filed its bill in the superior court against Hultberg, Johnson, the Swedish Evangelical Mission Covenant of America and the Merchants' Loan and Trust Company, praying that the award above mentioned be set aside, invalidated and held for naught, and that the title of the complainant be established by the decree of said court as against the claim of Hultberg and the covenant; also asking for an injunction restraining the Merchants'

Loan and Trust Company from paying out a certain sum of money which had been disposed of by the award of the arbitrators. This last bill was subsequently amended, and by agreement of the parties the cause was transferred to the circuit court to be heard in connection with the bill filed for judgment on the award. Johnson and Anderson each filed answers and cross-bills attacking the award on substantially the same grounds alleged in the bill filed by the White Star Mining Company, which were, in substance, as follows:

(1) The submission agreement was special, and the arbitrators were bound to decide the controversy on legal and competent evidence only, and according to law, which they failed to do.

(2) At the date of the submission the claim for the proceeds of the mine prior to June 17, 1905, contended for, was held and controlled by the covenant, which had not signed and was not a party to the submission, and such claim was not acquired by Hultberg until September 8, 1903, nearly a month after the submission, and the award including such proceeds is void.

(3) Anderson was deprived of such an accounting as under the contract and in fairness and justice he was entitled to, and for this reason the award is vitiated.

(4) The award is void and should be set aside because the arbitrators made a gross mistake, and were guilty of such misconduct as amounted, in law, to a fraud, in awarding against Anderson the sum of $80,000, being the proceeds of the mine in 1902, when it was the property of the White Star Mining Company of California.

(5) The arbitrators made a mistake of law in disregarding the settlement between the covenant and Anderson and the written release executed by the covenant to Anderson.

(6) The bill to enforce the award is a bill for the specific performance of a contract, and the relief thereunder should not be granted for the reason that the award is inequitable and unjust.

(7) There was a mistake made by the arbitrators as to the question of the existence of a trust; that Hultberg is estopped; and the award is in violation of the United States constitution, depriving the parties of their property without due process of law; also that the circuit court erred in disposing of the $6813.75 on deposit with the trust company.

The defendants Hultberg and the covenant insist, by their answer, first, that the arbitration agreement was valid and binding upon all the parties purporting to sign it; that the hearing before the arbitrators was in strict accordance with the submission agreement and the award was within its terms; that in the absence of actual fraud the court will not disturb the award of the arbitrators.

Issues being joined on the bills and cross-bills of the parties, the causes, as consolidated, were heard by the chancellor in open court, and a decree was entered dismissing the original and amended bill of the White Star Mining Company and the cross-bills of Claes W. Johnson and Peter H. Anderson, and granting the relief prayed in the bill of Hultberg. The decree found that Peter H. Anderson should forthwith pay to Hultberg the sum of $232,200, with interest thereon at the rate of five per cent per annum from April 13, 1904, and that in default of payment execution issue thereon, and that Hultberg be at liberty to apply to the court for such other and further orders as should be necessary to compel said payment; that the White Star Mining Company and Claes W. Johnson pay to Hultberg the sum of $23,686.25, with interest thereon at the rate of five per cent from April 13, 1904, and that in default thereof execution issue, and that Hultberg have the privilege of applying to the court for such orders as should compel payment; that the Merchants' Loan and Trust Company should pay to Hultberg the sum of $6813.75, and that in default of payment execution issue thereon; that the White Star Mining Company should deliver to Hultberg possession of claim No. 9 Above, and that in default of said delivery Hultberg should be per-

mitted to apply to the court for such orders as would compel such delivery; that the White Star Mining Company execute and deliver to Hultberg a good and sufficient conveyance of claim No. 9 Above, conveying all of the title of the White Star Mining Company, and that in default of such conveyance Hultberg should be permitted to apply to the court for necessary orders. The court reserved jurisdiction for the purpose of determining the question of appointing a receiver and the fixing of a proper bond to be given by the White Star Mining Company. From this decree an appeal has been prosecuted to this court by the White Star Mining Company, and errors have been assigned both by Johnson and Anderson separately.

At a former term a motion was made by appellees Hultberg and the covenant to dismiss the appeal on the ground that a freehold is not involved, and this court is therefore without jurisdiction. In support of the motion it is insisted that the fee simple title to claim No. 9 Above, according to the allegations of the second amended bill, is still in the United States, and the appellant, instead of having a freehold, has simply the right to acquire one if it chooses.

Section 910 of the Revised Statutes of the United States provides that no possessory action between persons in any court of the United States for the recovery of a mining title or for damages to any such title shall be affected by the fact that the paramount title to the land in which such mine lies is in the United States, but each case shall be judged by the law of possession. In the case of *Aspen Mining Co.* v. *Rucker,* 28 Fed. Rep. 221, Mr. Justice Brewer, touching this question, said: "It is well to understand definitely what the title of these parties is. The averment of the bill is that they are owners and in possession. The answer, admitting the ownership, simply pleads that the patent has not issued and that the fee simple title remains in the government. The import of these averments is that the equitable title is in the parties, the legal title in the government. The property is

called a 'mining claim,' and it is alleged in the bill that it was discovered and located by certain parties in 1880, all of whose interests have become vested in the present litigants. The statutes of the United States provide that upon performance of certain conditions the discoverer of a mine becomes entitled to a patent. If all these conditions have been performed the full equitable title is vested in the discoverer, and all that the government retains is the naked legal title in trust for the equitable owner. If only partially performed he has an absolute right of possession and an inchoate title, which further performance will perfect and complete. Such a right, possessory in its nature, yet coupled, under existing laws, with further rights as to acquisition of title, is declared by the statutes and the decisions of the Supreme Court of Colorado to be a real estate title. Such a property passes to the heir, is subject to seizure and sale as real estate, must be conveyed by deed and is subject to partition."

In *Merritt* v. *Judd,* 14 Cal. 61, the question was as to the nature of the tenure by which mineral lands in that State were held. It was urged in argument that the occupant of a mining claim is not the owner of a freehold estate in the premises, and not being such owner, had, consequently, no right to the fixtures therein, but that the Federal government was the owner of the soil. The court said: "From an early period of our State jurisprudence we have regarded these claims to public mineral lands as title. They are so, practically. * * * Our courts have given them the recognition of legal estates of freehold; and so, to all practical purposes, if we except some doctrines of abandonment not, perhaps, applicable to said estates, unquestionably they are; and we think it would not be in harmony with this judicial system to deny to them the incidents of freehold estates in respect to this matter." To the same effect is *Hughes* v. *Devlin,* 23 Cal. 501.

In *Gwillin* v. *Donnellan,* 115 U. S. 45, the court said: "The title to the vein depends upon the right to the occu-

pancy or the ownership of its apex within the limits of the right to the occupation of the surface. This right may be acquired by a valid location and continued maintenance of a mining claim or by a patent from the United States for the land. * * * A valid and subsisting location of mineral lands, made and kept up in accordance with the provisions of the statutes of the United States, has the effect of a grant by the United States of the right of present and exclusive possession of the lands located."

In *Manuel* v. *Wulff,* 152 U. S. 505, Chief Justice Fuller delivering the opinion said: "By section 2322 it is provided that when such qualified persons shall have made discovery of mineral lands and complied with the law they shall have the exclusive right to possession and enjoyment of the same. It has therefore been repeatedly held that mining claims are property in the fullest sense of the word, and may be sold, transferred, mortgaged and inherited without infringing the title of the United States, and that when a location is perfected it has the effect of a grant by the United States of the right of present and exclusive possession."

Applying these authorities to the question at issue, admitting the title was in the United States, yet there had been a compliance with all of the requirements of law with reference to the acquisition of the claim, and the rights acquired thereunder could be maintained against all other parties. In the light of these facts a freehold was involved and the appeal was properly perfected to this court. Decisions of this court cited in support of the motion are not in point.

It is, however, insisted that the statute of this State was not intended to cover freeholds located in other States or territories, and for this reason the suit could not be maintained. In the case of *Alexander* v. *Tolleston Club,* 110 Ill. 65, we said (p. 77): "It is well settled that courts of equity may decree the specific performance of contracts respecting land situated beyond the jurisdiction of the State where the suit is brought. The ground of this jurisdiction, as said by

Story, is, that courts of equity have authority to act upon the person; and although they cannot bind the land itself by their decree, yet they can bind the conscience of the party in regard to the land and compel him to perform his agreement according to conscience and good faith. * * * And in *Massie* v. *Watts,* 6 Cranch, 148, Chief Justice Marshall delivering the opinion of the court, it is laid down 'that in a case of fraud, of trust or of contract, the jurisdiction of a court of chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree.' " To the same effect is the case of *Craft* v. *Indiana, Decatur and Western Railway Co.* 166 Ill. 580. The court in the case at bar had jurisdiction of the parties by personal service and could enforce its decree *in personam,* and therefore had jurisdiction of the subject matter.

There is no substantial merit in the motion made to strike the assignments of error of Johnson and Anderson from the record, and it will be overruled.

An attempt was made in the court below by the appellant to deny its signature to the agreement of submission, for the reason, as it claimed, that the execution of that submission was not authorized by the board of directors of the White Star Mining Company but was only signed by its president. We think the circuit court properly held that the signature of the president, with the seal of the corporation, made the agreement binding upon the company. The record shows that it participated in the selection of the arbitrators, and in all the proceedings before them up to the time of the final decision of the case, without any objection whatever. It would require a strong showing of want of power in the officer signing the articles of submission on its behalf, to justify a court in permitting the corporation to stand by, act upon that agreement throughout the entire arbitration proceedings, and then repudiate the agreement after the decision of the arbitrators was rendered against it.

On the merits of the case, that which is entitled "Brief and argument for appellant," consists of 256 pages. The first 145 pages consist of a commingled statement of facts, law and argument, one heading being, "Argument on the facts." Following these 145 pages, beginning on page 146 is the title "Brief." The preceding pages are in direct violation of rule 15 of this court. Counsel perhaps realized that fact, and sought to make the remaining portion conform to the rule by stating briefly the points and following the same by the argument. This case well illustrates the wisdom of the foregoing rule as an aid to the court in reaching a conclusion as to the law and facts of the case. It would be impossible to follow the brief and argument as a whole. We shall consider only the latter part of it as above indicated, which we regard as sufficiently covering the case. Two of the points are as follows:

(1) "If the submission be general to hear and decide all questions without any directions or limitations in the articles of submission, the award is conclusive, and cannot be set aside unless it shall appear from the opinion of the arbitrators, or by their admission, that they intended and meant to decide according to law. In such a case a mistake in the law confers judisdiction upon the court to review and impeach and set aside such award.

(2) "If the submission be special, providing that the arbitrators must decide according to law and give to the parties the benefit of the law touching the matters submitted, then such question whether they shall have so decided is jurisdictional, and their mistake as to the law must be investigated and relief will be granted."

The first of the foregoing propositions is not an accurate statement of the law. The rule is, that if an award is in conformity with the general submission and no fraud or mistake appears upon the face of the award, it will not be interfered with or set aside by the court for errors, either of law or fact, committed by the arbitrators. This court held

in the case of *Sherfy* v. *Graham,* 72 Ill. 158, that arbitra-tors, "by the submission, become judges, by the choice of the parties, both of the law and the facts, and there is no appeal or review from or of any decision made by them within the scope of their powers, except for fraud, partiality or misconduct. (Citing several prior decisions of the court.) Nor will a mistake of law or fact by the arbitrators be a ground for setting aside an award, but a mistake in the draft of the award may be reformed so as to conform to the one actually made by the arbitrators. (*Pulliam* v. *Penson-eau,* 33 Ill. 375.) Thus it will be seen that there are but few grounds upon which a finding may be set aside or reviewed."

In *Barchell* v. *Marsh,* 17 How. 344, the Supreme Court of the United States held the following language: "Arbi-trators are judges chosen by the parties to decide the mat-ters submitted to them finally and without appeal. As a mode of settling disputes it should receive every encourage-ment from courts of equity. If the award is within the sub-mission and contains the honest decision of the arbitrators after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A con-trary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement—not the end—of litigation. 'In order,' says Lord Thurlow, (*Knox* v. *Sym-monds,* 1 Ves. Jr. 369,) 'to induce the court to interfere there must be something more than an error of judgment, such as corruption in the arbitrator or gross mistake, either apparent on the face of the award or to be made out by evi-dence; but in case of mistake it must be made out to the sat-isfaction of the arbitrator, and that if it had not happened he should have made a different award. Courts should be careful to avoid a wrong use of the word 'mistake,' and by making it synonymous with mere error of judgment assume to themselves an arbitrary power over awards. The same result would follow if the court should treat the arbitrators

as guilty of corrupt partiality merely because their award is not such an one as the chancellor would have given. We are all too prone, perhaps, to impute either weakness of intellect or corrupt motives to those who differ with us in opinion. * * * Evey presumption is in favor of the validity of an award. * * * If they [the arbitrators] have given their honest, incorrupt judgment on the subject matters submitted to them, after a full and fair hearing of the parties, they are bound by it, and a court of chancery has no right to annul their award because it thinks it could have made a better."

Among the many cases sustaining the same proposition may be cited *Huckstein & Co.* v. *Kaufman & Bros.* 173 Pa. St. 199; *Jones* v. *Boston Mills,* 6 Pick. 155; *Johnson* v. *Noble,* 13 N. H. 286; *Harris* v. *Social Manf. Co.* 41 R. I. 133; *Goodard* v. *King,* 40 Minn. 464; *Wood-working Co.* v. *Snyder,* 119 N. Y. 475; *Perkins* v. *Wing,* 10 Johns. 147; *Herrick* v. *Blair,* 1 Johns. Eq. 101.

We do not understand there is any conflict in the decisions, either in this country or England, to the effect that courts of equity will not set aside an award for errors, either of law or fact, except for mistake, corruption or fraud on the part of the arbitrators. The award in this case is clearly within the terms of the submission and decides the questions which by that submission the arbitrators were required to decide. Nor have we been able to find any proof of misconduct or partiality on the part of the arbitrators, and certainly nothing of that kind appears upon the face of the award itself. Therefore, treating the submission as general and the award within the submission, no fraud or mistake of law or fact appearing upon the face of it, the foregoing decisions clearly sustain the decision of the circuit court in refusing to interfere with or set aside the award.

It is, however, earnestly insisted on behalf of the appellant that its case does not fall within the foregoing authorities, for the reason that the submission here was not general,

but special. The second proposition, as shown above, is, that this submission is a special one, providing that the arbitrators must decide according to the law, etc., and therefore the question whether they shall have so decided is jurisdictional, and their mistakes as to the law must be investigated and relief will be granted. Upon the soundness of this position the appellant's case must, in our opinion, stand or fall. A long list of authorities is referred to in support of the conclusion announced, but an examination of the authorities will show that they do not unqualifiedly sustain the proposition. Certainly the Illinois cases cited have no direct bearing upon the question.

In the first place, just what is meant by a special submission is not made clear. This submission, on its face, seems to us a most general one. It is true that language is used in it to the effect that the decision of the arbitrators shall be upon competent evidence and according to law, but we are unable to see wherein the legal effect of the agreement, as a whole, would have been different if such language had been omitted. It is therein stipulated by the parties that the arbitrators shall be the judges of the competency of evidence; that they shall to the best of their ability hear, determine and adjudicate upon such matters in controversy on broad principles of equity and justice, having due regard as well for the moral as the legal rights of said parties and the law of the land; that the object of the parties is that there shall be a full, complete and just determination between them of all matters in controversy embraced in the agreement, regardless of all technicalities, and that such adjudication shall be had upon the broad merits of said controversy according to law; that the decision, when made and carried out as stated in the agreement, shall be for the purpose of finally ending, compromising and absolutely determining all of said differences and controversies and demands whatsoever had, made, arising or accruing, or which at any time ·or times might be had by or between said parties, for or by

reason or means of said mine, mining claim or the proceeds thereof, in any manner or thing relating thereto or resulting therefrom; that the parties, and each of them, agree to abide by, carry out and perform any decision and determination arrived at by said arbitrators or a majority of them, and that all the parties executing the agreement thereby appoint the said arbitrators, or such of them as might act thereunder, as their agents, respectively, for them and in their behalf to settle finally and conclusively all of said claims and demands made by the said Nels O. Hultberg, as therein set forth, and agree to be bound by the acts of their said agents.

The parties undoubtedly intended that the arbitrators should decide in conformity with the law and equity of the case, and that is generally the intention of parties submitting matters in controversy to arbitration; but there is nothing in the article of submission in the present case to indicate that they did not intend that the arbitrators themselves should be the judges of the principles of law governing the rights of the parties. There is no provision made for a review by the courts, nor are the arbitrators required to refer any question to the courts for determination. Had the circuit court set aside the award, it must, as we think, have done so merely because it entertained a different view of the law from that adopted by the arbitrators, the result of which would have been to render this and all similar arbitration absolutely futile. The parties themselves, at the time they entered into the agreement to arbitrate all differences between them, certainly entertained radically different views of the law,—that is, they must have widely differed in their understanding as to the law governing the creation of trusts, the binding effect of the agreement on behalf of the covenant to release its claim to the property, and so as to all other matters of difference. It was to settle that dispute that the matters in controversy were referred to arbitration, and yet the position of appellant now is that the parties only intended to be bound by the decision of the arbitrators provided their

decision sustained its, or his, contention as to what the law was. If that is so, then the controversy was no nearer a settlement after the award than before. Either party finding his views of the law not sustained by the award could go into court and have it set aside or have the court determine his legal rights. If such a position is tenable, then, indeed, as said by the Supreme Court in *Barchell* v. *Marsh, supra,* the award was the commencement, and not the end, of litigation. The law applicable to the facts of any given case cannot be stated with absolute certainty. Rules of law may be accepted as settled, but it is well known that in the application of those rules or legal principles to different facts, courts and lawyers, as well as parties interested, may, and often do, differ very widely. The case was to be decided according to law, but the arbitrators, in the absence of an expressed intention to the contrary, were to be their own judges as to what the law was, otherwise the parties would have provided that the case should be subject to review by the courts or that the legal questions should be referred to some other tribunal for final determination. Had that been done the submission might properly be called a special submission. Moreover, we think the better reasoned cases sustain the view that even where the articles of submission clearly and unqualifiedly require the decision of the arbitrators to be according to law or in comformity with the principles of the law, the language is not to be construed as a limitation upon the power of the arbitrators, but as merely directory.

*Bigelow* v. *Newell,* 10 Pick. 348, was a proceeding to avoid an award made by arbitrators on a submission in which they were only authorized to decide according to the legal rights of the parties, the language being, "always having regard to the legal rights of the parties," and Chief Justice Shaw rendering the opinion of the court, said: "A reference to the general effect and terms and obvious purpose and design of this agreement will show that the clause in question, 'always having regard to the legal rights of the

parties,' was intended to prescribe a rule for the government of the referees as to the principles upon which they were called upon by the parties to decide, and not as a limitation of their authority. The latter would in a great measure have defeated the purposes of the reference."

In *Mickels* v. *Thayer,* 14 Allen, 114, Chapman, J., speaking of the submission before the court, said: "The next clause is important: 'The said referees are to determine all questions according to the rules of law and equity, the same as though the matter was to be tried in a court of law or equity.' One of the principal questions made in the case is whether this clause is to be interpreted as a limitation of the power of the arbitrators or whether it is merely directory. If it is directory, it leaves them to be the ultimate judges as to how the matter would be tried in a court of law or equity, and thus makes their decision final and conclusive, as the parties agree it shall be. But if it is a limitation of the powers, then the award is not final or conclusive, but this court is the ultimate tribunal to decide how the principal questions ought to be settled. It is an objection to this view that the only power thus left to this court is of a destructive character in case of our disagreement with the arbitrators. We may destroy the award but have no power to correct it. The agreement is to be interpreted in the light of the settled principles of law. In *Fairchild* v. *Adams,* 11 Cush. 549, Chief Justice Shaw says: 'It has long since been settled that awards are conclusive on all matters of fact submitted to the arbitrators.' He also says that 'in the State courts it has been a very regular course for many years to hold that where no error or mistake appears upon the face of the award the decision of the referees is conclusive in law.' He enumerates the exceptions to this rule, as where there has been unfair conduct on the part of the referees; where they are deceived by one of the parties to the injury of the other; and when there is raised, on the face of the report itself, a question of law which is submitted by the referees to the judgment of

the court.    It had been previously settled that when unfairness or corruption on the part of the arbitrators was alleged, their conduct might be fully investigated on that point in a suit to enforce the award.    (*Strong* v. *Strong,* 9 Cush. 568.)    In commenting in *Fairchild* v. *Adams* upon the case of *Bigelow* v. *Newell,* 10 Pick. 348, where the parties used, in their agreement of submission, the phrase 'always having regard to the legal rights of the parties,' and where the award was held to be valid though it was not in all respects conformable to law, the chief justice forcibly states the principle upon which awards stand: 'The ultimate reason for maintaining any award is, indeed, that the parties have selected their own arbitrators and agreed to refer certain things to their determination as their attorneys.    And it is idle to say that they have a right to do that, and that when they have done it the decision of the arbitrators, fairly made, is not final.'    The decision in *Bigelow* v. *Newell,* that the clause 'always having regard to the legal rights of the parties' is not a limitation of the authority of referees, is applicable to the clause in question in this case.    Evidence was admitted *de bene esse* as to all the proceedings of the arbitrators and the evidence upon which they made their award. There is nothing in it to show that they did not hear the parties fully and fairly or that they acted under the influence of improper motives, nor is such misconduct imputed to them. Gross errors and mistakes in their conclusions of fact and of law are alleged, and that is all.    But it is not alleged that any of these mistakes or errors are apparent upon the face of the award.    As to the matters of fact, the learned counsel of the defendants have argued to us that from the evidence which was before them they ought to have decided the facts differently.    But as we have no right to look into the evidence for the purpose of correcting their errors of judgment, in the absence of fraud, the argument can avail nothing." The foregoing language is clearly applicable to the case at bar and we regard the reasoning unanswerable.

In *In re Curtiss,* 64 Conn. 504, the submission provided that the arbitrators "shall proceed upon the principles of equity in hearing the matters in dispute and make their award, it being the desire of both parties that the matters in dispute between them shall be equitably settled and adjusted, so each may have all that is equitably due to him from the other." Andrews, C. J., rendering the opinion of the court, said: "Counsel for the appellant, in their brief, speak of this designation of the authority given to the arbitrators as a limitation. We do not so read it. To us it seems rather a liberal and highly creditable grant of power. In hearing the matter committed to them, and in making their award, the arbitrators are commanded to act upon the principles of equity, to the end that each of the parties may have from the other all that he is equitably entitled to."

Cases are to be found holding that when the parties have clearly indicated their intention that the award shall be in conformity with the principles of law, and proceed upon the assumption that the arbitrators know the law and are only to inquire into the facts and apply the rules of law to those facts in their decision, and it is shown by the award itself, to a court of competent jurisdiction, that the arbitrators decided contrary to law, the award will be set aside, the reason being, that the arbitrators have mistaken the law which they were presumed to understand, and the decision is not within the scope of their authority as determined by the submission, and is for that reason void. But when the parties have expressly or by reasonable implication submitted the questions of law as well as the questions of fact arising out of the matter in controversy, the decision of the arbitrators on both subjects is final. It is upon the principle of *res judicata,* on the ground that the matter has been judged by a tribunal which the parties have agreed to make final and a tribunal of last resort for that controversy, and therefore it would be as contrary to principle for a court of law or equity to re-judge the same question as for the inferior court to re-

220—39

judge the decision of the superior court, or for one court to overrule the judgment of another where the law has not given jurisdiction or a revising power acting directly upon the judgment alleged to be erroneous. (Opinion by Chief Justice Shaw in *Boston Water Co.* v. *Gray,* 6 Metc. 131.)

The authorities also hold that where it appears from an award that the arbitrators base their decision upon certain rules of law or upon a finding of certain facts, and it is clearly apparent that they misapprehended the law or the facts, a court of equity will set the award aside or reform it upon the ground of mistake. But in such cases the facts must appear on the face of the award itself. In *Harris* v. *Social Manf. Co.* 41 R. I. 133, Bullock, J., used this language: "Again, it is said the award is founded upon a 'plain mistake in law.' The rule is, that when parties, in express terms or by plain implication, submit both the law and the facts of a controversy, the decision of the arbitrators is final and conclusive and the award becomes in the nature of a judgment of a court of the last resort. There is an exception to this rule when a plain mistake in the law appears on the face of the award. In such a case the arbitrators undertake to decide according to law and the award shows they have not so determined, and so a plain mistake in fact where the mistake appears upon the face of the award. But such mistake should not only thus appear, but be a mistake so affecting the principle upon which the award is made, and be so plain and material, that if the arbitrators had been apprised of it before making the award they would have awarded differently. Mere error of judgment is no ground for setting aside an award; neither that the arbitrators have drawn, apparently, wrong conclusions from the facts or the evidence." Cockburn, C. J., in *Hodgkinson* v. *Fernie,* 3 C. B. (N. S.) 189, on the same subject, says: "But the modern cases which have been cited certainly go to the length of deciding that unless there be something upon the face of an award to show that the arbitrator has proceeded upon

grounds which are not sustainable in point of law, the court will not entertain an objection to it."

In *Jocelyn* v. *Donnel,* Pick. (Tenn.) 274, (14 Am. Dec. 153,) Haywood, J., said: "An award good upon the face of it cannot be impeached but upon objections which go to the misbehavior of arbitrators. If the reception of illegal evidence appear upon the award it may be set aside, or if a mistake of fact appear upon the face or by confession of the referee it shall be re-committed; but the court cannot inquire, by extrinsic testimony, into the justice of the award, for that would be to try the matters in dispute *de novo*. If the arbitrators, upon their award, have meant to go by the rules of law and have mistaken the same, the award may, perhaps, be set aside for such mistake, though even this is doubtful. But where no such intent appears in the face, the most obvious deviation from the rules of law will not vitiate the award. Arbitrators are to decide according to their own opinions of equity and conscience, without being tied down to the observance of precedents, either of law or equity, or of any other positive rules."

By reference to the award set out above it will appear that it does not purport to be based upon any stated rules of law or particular finding of facts.

Counsel for the appellant, however, seem to hold, that in determining whether the arbitrators mistook or misunderstood the law we may take into consideration the written separate statement of the arbitrator Hiram T. Gilbert. The authorities, so far as we have been able to ascertain, hold the contrary view, even where the arbitrators declare that such statements or opinions are to be taken as a part of the award. In *Smith* v. *Boston and Maine Railroad Co.* 16 Gray, 521, the arbitrators, after signing the award, attached a memorandum signed by them, to the effect that "a statement of the facts and principles upon which the foregoing award was made is at the request of the said Smith hereto annexed, signed by the said arbitrators and to be taken as part of said

award," and the court said: "The only possible ground for raising any question as to the conclusiveness of this award is that founded upon the supplemental paper accompanying the award, signed by the arbitrators and in these words: * * * The further inquiry is whether this instrument signed by the arbitrators brings the case within the class of cases in which the courts have revised the doings of the arbitrators, and held the award invalid if found erroneous in its decisions upon matters of law arising in the case. One of the familiar cases where such supervision is exercised is where the arbitrator, by his award, refers the questions of law to the decision of the court, making his award in the alternative, as the court may pronounce the law. This is very intelligible, and adapted to all cases where the arbitrator does not purpose to have his award final and where the award is returnable to the courts of law. That is not the present case, however. Another case stated in the authorities upon this subject, and that upon which this award is to be set aside, if at all, is this: 'Where it is manifest, upon the award, that the arbitrator intended to decide according to law but has mistaken the law.' This ground has been supposed to open awards where the report of the arbitrators has presented, on its face, the full ground of the making the award for supervision,—and many cases may be found of its recognition. This proposition assumes that the error is manifest on the award itself, and, as it seems to us, it must be taken with the qualification that the award so clearly indicates the purpose of the arbitrator to decide by the strict rule of law, that it justifies the judicial mind in supposing that the arbitrator would have made a different award had he known that the judicial tribunal held a different view of the questions of law arising in the case from those entertained by himself." And the court then proceeds to hold, in a well considered opinion, that said statement could not be properly considered as a part of the award for the purpose of impeaching it. The opinion of the arbitrators which binds the

parties is that which they have expressed by their award. Judgments of courts do not depend upon the opinions rendered in the courts, neither can the validity of awards be made to depend upon the soundness of the opinions of the arbitrators not shown by the awards.

Our conclusion is that there is no theory of the law upon which a court of equity can take jurisdiction of this case to review and set aside the decision of the arbitrators, and that all questions urged for our decision which have been passed upon by the arbitrators, as shown by their award, are *res judicata* here.

We have attentively considered the other questions raised in the argument and urged as grounds of reversal of the decree below, but find them without sufficient merit to justify an extension of this opinion by commenting upon them. We think the chancellor who heard the cause in the court below decided it correctly, and the decree will be affirmed.

*Decree affirmed.*

HAND, J., and CARTWRIGHT, C. J., dissenting:

It appears from the pleadings and proofs found in the record filed in this case, that the Swedish Evangelical Mission Covenant of America, (called herein the covenant,) a corporation not for pecuniary profit, was organized under the laws of the State of Illinois in the year 1885; that in 1887 it established a mission for the education and christianization of the Eskimos at Unalaklik, Alaska; that in 1893 it established a second mission at Chinik, in said territory; that Alex Edward Carlson was placed by it in charge of the mission at Unalaklik and Nels O. Hultberg in charge of the mission at Chinik; that in the year 1897 Peter H. Anderson was sent to Chinik by the covenant as a teacher and assistant to Nels O. Hultberg; that in the summer of 1898 gold was discovered on Anvil creek, a tributary of Snake river, situated about eighty miles from Chinik; that on the 15th day of October, 1898, the Cape Nome Mining District was or-

ganized, which district included within its limits Anvil creek; that on October 18, 1898, claim "No. 9 Above," on Anvil creek, was located by G. W. Price by power of attorney, in the name of his brother, R. L. Price; that on November 17, 1898, G. W. Price, as attorney in fact of R. L. Price, sold and conveyed said claim No. 9 Above to Peter H. Anderson; that Peter H. Anderson and his successors in title did all the necessary assessment work required by the mining laws of the United States upon said claim No. 9 Above from the time of its location by G. W. Price to and including the year 1903; that on May 28, 1902, Peter H. Anderson conveyed claim No. 9 Above to the White Star Mining Company, a corporation organized under the laws of the State of California and capitalized for the sum of $500,000, the capital stock of which was owned by Peter H. Anderson, with the exception of three shares; that on May 19, 1903, the White Star Mining Company of California conveyed said claim No. 9 Above to the White Star Mining Company of Illinois, a corporation organized under the laws of the State of Illinois and capitalized for the sum of $25,000, the capital stock of which was all owned by Claes W. Johnson, with the exception of twenty shares; that subsequent to the purchase of said claim No. 9 Above by Peter H. Anderson the covenant claimed to be the owner of said claim No. 9 Above, and that Peter H. Anderson held said mine, and the gold taken therefrom, in trust for it; that on August 16, 1901, Peter H. Anderson made a donation to the covenant of $54,000 in cash, in consideration of a release to him by it of all its interest, if any, in said claim No. 9 Above and the gold taken therefrom, and the president and secretary of the covenant on that day executed to him a formal release thereof under the seal of the covenant, and that their action was taken with the knowledge and consent of its board of trustees, and was approved afterwards by its general conference, from which date it has had and still retains said $54,000; that on June 17, 1903, the covenant conveyed its interest, if

any, in claim No. 9 Above to Nels O. Hultberg, and on September 8, 1903, assigned to Nels O. Hultberg its claim for all gold taken out of said claim No. 9 Above since its location, against Peter H. Anderson, Claes W. Johnson, the White Star Mining Company of California and the White Star Mining Company of Illinois; that on August 4, 1903, Nels O. Hultberg, at Nome, Alaska, where Nels O. Hultberg and Claes W. Johnson were, served a demand upon Claes W. Johnson, who was operating said mine for the White Star Mining Company of Illinois, for the possession of said claim No. 9 Above, and called upon him to account for the gold that had been taken from said claim No. 9 Above subsequent to June 30, 1903; that claim No. 9 Above, during the time Peter H. Anderson, Claes W. Johnson and the White Star Mining Companies had been in possession thereof, had yielded more than $400,000 in gold, which gold had been retained by them, with the exception of $95,000, which had been paid by Peter H. Anderson, in the form of donations or otherwise, to the covenant.

Nels O. Hultberg, on his own behalf, and Claes W. Johnson, on behalf of himself and the White Star Mining Company of Illinois, of which he was president, on the 12th day of August, 1903, executed an agreement to submit the matters in difference between them to arbitration, which submission was signed by Peter H. Anderson at a later date in Chicago. The substance of the submission agreement executed by said parties is set out in the majority opinion.

David F. Lane, a mining operator of Berkeley, in the State of California, and A. M. Pence, an attorney at law of the city of Chicago, were chosen as two of the arbitrators, and they chose Hiram T. Gilbert, an attorney at law of the city of Chicago, as the third, and on the 13th day of April, 1904, Lane and Gilbert made and signed an award in writing. Pence refused to join therein. The award, in part, is as follows:

"*First*—With respect to the claims and demands of said Nels O. Hultberg, so far as the White Star Mining Company of Illinois and Claes W. Johnson are concerned, we decide that said Nels O. Hultberg is the owner of that certain placer mine and mining claim mentioned in said agreement, known as and called 'No. 9 Above, on Anvil creek,' situate in the Cape Nome mining and recording district, in the District of Alaska, and we award to him, said Nels O. Hultberg, the said placer mine and mining claim, and direct the said White Star Mining Company of Illinois to forthwith convey and deliver possession thereof to said Nels O. Hultberg; and we further decide that the output of said placer mine and mining claim, and the gold extracted therefrom during the mining season of 1903, after deducting therefrom a sufficient amount of gold or moneys to pay and defray all the expenses of said White Star Mining Company of Illinois and said Claes W. Johnson in operating said mine and mining claim, including labor and material purchased therefor during said time, and also after deducting therefrom the further sum of $9000, which said last mentioned sum is to be had and received by said Johnson out of said output for his personal services, which said output, after making the deductions aforesaid, is the sum of $26,000, belongs to said Nels O. Hultberg, and we award said sum to him, the same to be accounted for by said White Star Mining Company of Illinois and by said Claes W. Johnson and turned over by them to said Nels O. Hultberg immediately.

"*Second*—With respect to the claims of said Nels O. Hultberg against said Peter H. Anderson, we decide that said Nels O. Hultberg is entitled to recover from said Peter H. Anderson the sum of $232,200, and we award said sum to said Nels O. Hultberg, to be paid to him immediately by said Peter H. Anderson.

"*Third*—We award to the said Nels O. Hultberg the sum of $250 to be paid by said White Star Mining Company of Illinois and Claes W. Johnson jointly, and the further

sum of $250 to be paid by said Peter H. Anderson, as his statutory costs and expenditures incurred by him in and about said arbitration, the said sums, amounting in all to $500, being agreed upon as correct and just by the said parties, and all other costs and expenses of said arbitration having by the agreement of the parties been paid out of moneys furnished said arbitrators for that purpose by said White Star Mining Company of Illinois, Claes W. Johnson and Peter H. Anderson, the amount so paid and furnished by said White Star Mining Company of Illinois and said Johnson being $1436.25 and the amount so paid by said Peter H. Anderson being $3750."

On April 15, 1904, Nels O. Hultberg filed a copy of said award in the circuit court of Cook county, and asked that judgment be entered thereon. On the next day the White Star Mining Company of Illinois, Claes W. Johnson and Peter H. Anderson entered their appearance in said proceeding and moved the court to vacate, set aside and annul the award, and the White Star Mining Company of Illinois on the same day filed its bill in chancery in the superior court of Cook county against Nels O. Hultberg, Claes W. Johnson, Peter H. Anderson, the covenant, and the Merchants' Loan and Trust Company of Chicago, praying that the award made by Lane and Gilbert be set aside, invalidated and held for naught, and that the title of complainant be established against the claim of Nels O. Hultberg and the covenant in and to said claim No. 9 Above, and the gold taken therefrom since its location; also asked for an injunction restraining the Merchants' Loan and Trust Company from paying out a balance of $6813.75 in its hands, which had been deposited with it by Nels O. Hultberg, Peter H. Anderson and Claes W. Johnson as a fund with which to meet the expenses incidental to such arbitration. The bill was amended, and by agreement the cause was transferred to the circuit court of Cook county to be heard in connection with the proceeding commenced in that court by Nels O. Hultberg to have judg-

ment entered upon said award. Claes W. Johnson, Peter H. Anderson, Nels O. Hultberg and the covenant each filed an answer and cross-bill. Claes W. Johnson and Peter H. Anderson attacked the award upon the same grounds as the original bill and prayed for the same relief as prayed for in the original bill, and Nels O. Hultberg and the covenant by their cross-bills sought to have the award enforced and carried into effect.

The issues being joined on the bill, cross-bills, answers and replications of the parties, respectively, the court entered a decree dismissing the original bill and amended bill of the White Star Mining Company of Illinois, the cross-bills of Claes W. Johnson and Peter H. Anderson, and granted the relief prayed for in the cross-bills of Nels O. Hultberg and the covenant. The decree directs that Peter H. Anderson pay to Nels O. Hultberg the sum of $232,200, with interest at five per cent from April 13, 1904; that the White Star Mining Company of Illinois pay Nels O. Hultberg the sum of $23,686.25, with interest at five per cent from April 13, 1904, and that the Merchants' Loan and Trust Company pay Nels O. Hultberg $6813.75, and directs the White Star Mining Company of Illinois to transfer to Nels O. Hultberg said claim No. 9 Above, and the court retained jurisdiction of the case for the purpose of appointing a receiver, if necessary, and making such further orders as might be necessary to carry the decree into effect. The White Star Mining Company of Illinois has prosecuted an appeal direct to this court to reverse said decree, and Peter H. Anderson and Claes W. Johnson have assigned cross-errors.

The first question that is presented for consideration in the determination of this appeal upon its merits is, did the trial court err in holding it did not have the power to go behind the award, as there was no proof of actual fraud upon the part of the arbitrators, and nothing appeared upon the face of the award to impeach the action of the arbitrators in making the award?

In this State three classes of arbitration are provided for. Two are regulated by statute and one exists according to the course of the common law. The submission in question was a common law submission, and it is governed by the common law. The article of submission is the warrant of authority of the arbitrators, and they can proceed legally only in accordance with the submission. They must decide all the questions submitted to them, and can decide only those questions which are submitted, and when the submission contains directions as to the manner in which the submission is to be executed and contains rules for the governing of the arbitrators in its execution, the arbitrators must proceed in the manner and under the rules laid down in the submission for their government, otherwise they will have exceeded their authority and their award will be void.

In *Bartlett* v. *Bartlett & Son Co.* 116 Wis. 450, (93 N. W. Rep. 473,) the court said: "The jurisdiction of arbitrators is absolutely and strictly limited by the contract of submission, whether such contract be one formally entered into between the parties or be implied from their being members of a voluntary organization which, by its rules, requires them to submit their differences to the particular tribunal. The jurisdiction of the arbitrators cannot be extended beyond the contract of submission by their decision upon any jurisdictional question. When the submission requires the matters to be determined to be tested by a particular rule, whether it be a rule of law or a rule of the corporation or association, the adoption by the arbitrators of a different rule, or a disregard of the rule and decision of the matter according to the notions of the arbitrators of what is just in the premises, is a departure from the submission, just the same as the inclusion in the submission of matters of difference not involved at all in the particular controversy to be settled."

There are two classes of submissions at common law,—general and special. By a general submission all questions of law and fact connected with the subject matter of the sub-

mission are submitted to the arbitrators, without limitation, for decision; by a special submission the subject matter of the submission is submitted to the arbitrators for decision, subject to the limitations found in the submission as to the method of procedure or the rules which are to govern the arbitrators' action in making the award. The power conferred upon the arbitrators is a delegated power, and the persons delegating the power may incorporate in the submission such limitations as they may deem proper which will govern the arbitrators, and that makes the arbitration special. In the submission of matters to arbitrators for decision it is common for the parties making the submission to provide in the submission that the arbitrators shall act upon competent evidence only, and that they shall proceed according to law in making their award, and it is held that such a limitation is binding upon the arbitrators, and if they disregard such limitation their action is void. If the submission is general, the arbitrators may decide both questions of law and fact. If it is special and provides the arbitrators shall determine the rights of the parties according to law, a plain mistake in the consideration of the law by the arbitrators is in violation of the terms of the submission and furnishes ample grounds upon which to avoid the award.

The law governing the matter now under consideration is thus laid down in the Cyclopedia of Law and Procedure (vol. 3, p. 740) : "Whenever the arbitrators are required, by the terms of the submission or by a statute or rule of court under which the arbitration proceeds, to determine the rights of the parties according to law, a plain mistake in their construction of the law is sufficient ground upon which to avoid the award." And in the American and English Encyclopedia of Law (vol. 2,—2d ed.—p. 783) : "Where the parties, by the express terms of the submission, stipulate and require that the hearing shall be conducted and the award made in conformity with the rules and principles of law, and the arbitrators are mistaken in their finding on the law, the

award will be set aside for such mistake." And Mr. Adams, in his work on Equity, (p. *192,) speaking of the cases in which the enforcement of the award may be successfully resisted, includes the following: "If they [the arbitrators] have acted on a mistake of law, when the law itself is not referred but the reference was to decide on facts according to law." And Morse, in his work on Arbitration and Award, (p. 300,) uses the following language: "The cases in which a mistake in law by the arbitrator will render his award void may be divided into two classes: (1) Where the parties themselves, in their submission, stipulate and require that the hearing shall be conducted or that the decision shall be made in conformity with the rules and principles of law; (2) where the arbitrators themselves, either by the shape in which they make their award or by embodying in it a statement of the grounds of their decision or of their intention to be governed by legal principles, have conferred upon the court a power of inquiry and revision which it would not otherwise have had. With regard to the first of these classes, it is admitted in all cases that it is perfectly competent for the parties to embody in their submission a valid limitation or restriction requiring the arbitrators to proceed and decide according to law."

In *Greenough* v. *Rolfe,* 4 N. H. 357, the submission provided that the referees "should decide the cause upon just and legal grounds." The award was set aside, and in deciding the case the court said: "In this case the referees were, by the agreement of the parties, as we understand it, restricted to decide according to law. We must therefore presume that they intended to make the law their guide, and as they have mistaken the law, this would be a good reason why the report should not be accepted."

In *White Mountain Railroad Co.* v. *Beane,* 39 N. H. 107, the court said: "A reference may be limited, and in such case any disregard of the limitations which the parties have prescribed will be fatal to the award, as, if the parties agree

that the arbitrators shall make their award agreeably to legal principles, and if they mistake the law the award will be set aside."

In *Sanborn* v. *Murphy,* 50 N. H. 65, the court said: "We have seen that the rule was in the common form, containing no restriction as to evidence or grounds of decision. * * * Parties may, and often do, limit a reference by providing that the award shall be made in accordance with legal principles, in which case the referees will be bound by the limitation; and if in such case they disregard or mistake the law, their award will be set aside."

In *Kleine* v. *Catara,* 2 Gall. 61, Mr. Justice Story said: "If the parties wish to reserve the law for the decision of the court they may stipulate to that effect in the submission. They may retain or enlarge its operation, as they please. If no such reservation is made in the submission, the parties are presumed to agree that everything, both as to law and fact, which is necessary to the ultimate decision, is included in the authority of the referees."

In *Boston Water Power Co.* v. *Gray,* 6 Metc. 131, which is a leading case upon the subject of arbitration, Mr. Chief Justice Shaw, in discussing the effect of a submission wherein the arbitrators are required to decide conformably to law, on page 166 says: "If the submission be of a certain controversy, expressing that it is to be decided conformably to the principles of law, then both parties proceed upon the assumption that their case is to be decided by the true rules of law, which are presumed to be known to the arbitrators, who are then only to inquire into the facts and apply the rules of law to them, and decide accordingly. Then, if it appears by the award, to a court of competent jurisdiction, that the arbitrators have decided contrary to law,—of which the judgment of such a court, when the parties have not submitted to another tribunal, is the standard,—the necessary conclusion is that the arbitrators have mistaken the law which they were presumed to understand. The decision is not within the

scope of their authority, as determined by the submission, and is for that reason void." And again, in the same case, in discussing the effect of the submission, wherein matters of law and fact are submitted to the arbitrators, on page 168 he says: "But where the whole matter of law and fact is submitted, it may be open for the court to inquire into a mistake of law arising from matter apparent on the award itself, as, where the arbitrator has, in his award, raised the question of law and made his award in the alternative, without expressing his own opinion; or, what is perhaps more common, where the arbitrator expresses his opinion, and, conformably to that opinion, finds in favor of one of the parties, but if the law is otherwise in the case stated, then his award is to be for the other party. In such case there is no doubt the court will consider the award conclusive as to the fact and decide the question of law thus presented. Another case, somewhat analogous, is where it is manifest, upon the award itself, that the arbitrator intended to decide according to law but has mistaken the law. Then it is set aside because it is manifest that the result does not conform to the real judgment of the arbitrator, for then, whatever his authority was to decide the questions of law, if controverted, according to his own judgment, the case supposes that he intended to decide as a court of law would decide, and, therefore, if such decision would be otherwise, it follows that he intended to decide the other way."

While the question here under discussion has not been passed upon by this court in the precise manner in which it is here presented, we think this court is committed to the doctrine announced by the text writers and adjudicated cases hereinbefore referred to.

In *Ryan* v. *Cudahy*, 157 Ill. 108, the question to whom certain margins which had been deposited to secure a trade upon the board of trade of the city of Chicago should be paid, arose between members of the board. The matter was submitted, under the rules of the board, to a committee, who

acted as arbitrators, for settlement and determination. The committee, on the hearing, refused to hear, as they were bound to do by the rules of the board, evidence that the price for which the margined product sold on the day the contracts were closed was a fictitious price, caused by that product being cornered upon the market. This court, in its decision, assumed the rule requiring the parties to arbitrate to be valid, and that the parties, being members of the board, were bound by that rule, but held, the committee having refused to give the parties a hearing according to the rules of, the board by refusing to permit them to make the proof offered, that a court of equity might rightfully assume jurisdiction over the subject matter of the litigation and cause an account to be stated between the parties and determine to whom the margin should be paid. On page 119 of the opinion it was said: "The committee appointed under section 6 of rule 20 to determine to whom the margin deposit belonged or should be paid may be regarded as a tribunal of limited jurisdiction, and they are bound to proceed in conformity to the rules under which they were selected, and if they failed to conduct the investigation in accordance with the charter and by-laws of the board of trade, under which they were appointed, the complainant ought not to be bound by their judgment. It seems plain that where property rights are involved, as is the case here, the courts have the power to so far supervise the action of a tribunal like the one in question as to determine whether they have proceeded according to the rules and regulations provided for their action, and, if they have failed in a substantial manner, correct abuses which may result from their unwarranted procedure."

The same question came before this court in *Pacaud* v. *Waite*, 218 Ill. 138, and it was there held the rule requiring the parties to arbitrate the question to whom margins should be paid upon deals upon the board of trade between its members was a valid regulation, and that a court of equity would not take jurisdiction to determine the question to whom such

margins belonged, unless the committee provided by the rules of the board of trade refused to proceed in accordance with the rules of the board.

In these cases the parties litigant were members of the board of trade. The committee occupied the position of arbitrators, and the rules of the board stood in the place of an article of submission. These rules pointed out the method in which the committee should proceed, and this court held if the committee failed and refused to proceed in accordance with the limitations placed upon it by the rules of the board, a court of equity might review its action. As showing the similarity of the proceedings before said committee and that before arbitrators, we quote the following from *Bartlett* v. *Bartlett & Son Co. supra:* "A trial by a tribunal of a board of trade, provided for by its rules, or that of any other voluntary organization, is like one before a board of arbitrators agreed upon by parties to the controversy submitted to them. Its scope is limited by the rules of the organization. A violation thereof is jurisdictional error which will vitiate the result, and if private rights of a contestant are injuriously affected thereby a court of equity can afford relief."

In view of the foregoing authorities, and on principle, we think it clear that when the submission provides the arbitrators shall determine the rights of the parties according to law such limitation is valid and binding upon the arbitrators, and if the arbitrators, in determining the rights of the parties, clearly mistake the law, a court of equity may set aside the award on the ground that in making the award the arbitrators have violated the terms of the submission. If such be the law, does the submission executed by the parties in this case require the arbitrators to decide the matters submitted to them according to law? That question must be determined from a consideration of the entire agreement of submission.

The submission recites that it is an "agreement of special submission to arbitration." This provision would indicate

220—40

that the parties understood the difference between a general submission and a special submission, and that they intended by the submission to limit the powers of the arbitrators, to some extent, at least. In other words, that they did not intend to submit the matters in controversy between them by a general submission to said arbitrators, otherwise they would not have designated the submission as a special submission. It is also provided in the submission that said arbitrators shall be the judges of the admissibility of evidence, and shall be liberal, and not technical, in the admission of evidence, but their conclusions shall be based upon legal and competent evidence only.

From the foregoing provisions it would seem clear that the parties intended the arbitrators should pass upon the admissibility of evidence as it was submitted, and that they should be liberal in their rulings upon the admissibility of evidence, but that they should nevertheless base their award upon legal and competent evidence, as contradistinguished from illegal and incompetent evidence. To illustrate: While the arbitrators should not require the same order of proof, the same exactness in the form of questions, and impose upon parties the same restraint in the examination and cross-examination of witnesses in the introduction of their evidence before the arbitrators which a court would require in a trial before the court or a jury, still the arbitrators should not permit an express trust to be established by parol testimony, nor hold that the burden of proof was upon a party who was sought to be charged as trustee to show he was not a trustee, or permit a party to recover upon a claim which he had released in consideration of the payment to him of a large sum of money, without at least a return of the money to the party who had paid it to him and whom he had sued.

The next provision found in the submission which limits the general powers of the arbitrators is, in substance: Said arbitrators, or any two of them, shall to the best of their ability hear, determine and adjudicate upon all such matters

in controversy upon broad principles of equity and justice, having due regard as well for the moral as the legal rights of said parties and the law of the land. Said arbitrators shall give to all parties hereto the full benefit and advantage of all rights, under the laws of any State or the District of Alaska, which might have been availed of in any prosecution or defense in any court, and particularly shall full benefit and advantage be given to any defense which might have been made in any suit or legal proceeding which might or could have been instituted by said Hultberg or said covenant, whether consisting of matters of law or fact, and any such last mentioned defense which shall be sustained by evidence or authority of statutory or common law shall be deemed a sufficient defense by the arbitrators, the same as it would have been if presented in any regularly constituted court of justice, and in case they shall find in favor of Hultberg, they shall, as the evidence and the facts and the law may warrant, award damages. They shall be the exclusive judges of the procedure, except as herein stated. The object of this submission is that there shall be a full, complete and just determination of all matters in controversy embraced herein, regardless of all technicalities, and that said adjudication shall be had upon the true merits of said controversy and according to law.

The foregoing provisions are broad and comprehensive, and provide in express terms that the matters in controversy between the parties submitted to the arbitrators for decision shall be by them decided upon "legal and competent evidence only" and "according to law." The only question, therefore, open to discussion on this branch of the case is, are these provisions mandatory or only directory?. If directory, the arbitrators could follow them or not, as they saw fit; if mandatory, they were bound to follow them, or their award would be void.

The evidence shows that the submission was prepared by able and competent lawyers, and it was designated by

them as a special submission, and it was expressly provided therein that the conclusions of the arbitrators should be based upon legal and competent evidence only, and the controversy decided according to law. Why designate the submission a special submission, if, as a matter of law, it was a general submission? Why provide that the arbitrators should base their conclusions upon legal and competent evidence only, and that the controversy should be decided according to law, if it was the intention of the parties that the arbitrators should comply with or disregard those provisions if they saw fit, and in case they did disregard them, the parties would be remediless? From a careful consideration of all the provisions found between the "four corners" of the submission we are impressed that the parties to said submission placed the provisions heretofore referred to therein for a purpose, and that those provisions cannot be disregarded as surplusage in determining the meaning of said submission, and that the provision that the controversy should be decided upon legal and competent evidence only, and according to law, must be held to be a limitation upon the powers of the arbitrators and mandatory and binding upon them, and such limitation as could not be disregarded by the arbitrators.

It is said, however, that this submission provides that the award of the arbitrators shall be final. True; but every submission, either in terms or impliedly, provides the award based thereon shall be a final settlement of the matters submitted to the arbitrators for their determination, and this award would have been final if the arbitrators had proceeded in accordance with the terms of the submission, and the reason it is not final is because the arbitrators did not proceed in accordance with the terms of the submission, but exceeded their authority, as defined in the submission. Professor Morse, in his work on Arbitration and Award, on page 87, in considering this question, says: "An agreement simply that the award shall be 'final and conclusive' is powerless to take away the right to assail its validity in the ordinary way

and upon the ordinary grounds. * * * Such a stipulation is subject to the implied condition that the award be made according to the submission." And in *Mussina* v. *Hertzog,* 5 Binn. 387, it was said: "Neither party is barred by the terms 'final and conclusive.' They are common to every rule of reference." And in *McCracken* v. *Clark,* 31 Pa. St. 498: "The language 'final and conclusive,' used in a submission, * * * is subject to the implied condition that the award be made according to it."

Our conclusion therefore is, the trial court erred in holding it did not have the power to go behind the award made by Lane and Gilbert, and to investigate the case upon its merits, with a view of determining whether the matters in controversy between the parties submitted to the arbitrators for decision were determined by them upon legal and competent evidence only, and according to settled principles of law.

It was claimed before the arbitrators that while the legal title to claim No. 9 Above was in Peter H. Anderson he held it in trust for the benefit of the covenant, and that it was his duty to convey the claim to the covenant and turn over to it the gold taken therefrom, on request, and that the appellant and Claes W. Johnson had acquired their interest in the claim with notice of the covenant's rights therein, and that they took the claim, and its proceeds, impressed with said trust, and that their rights therein were the same as, and no greater than, those of Peter H. Anderson.

On the trial in the court below there was introduced in evidence a certified copy of the proceedings before the arbitrators, which included a transcript of the evidence heard before them, from which it appears that on July 31, 1898, a party consisting of John Brynteson, H. L. Blake, Nels O. Hultberg, Christ. Kimber, J. A. Hagelin and a Mr. Porter went from Chinik up the coast on a prospecting trip; that, the weather being stormy, they entered Snake river and prospected in the vicinity of the mouth of that river for a day or two, and discovered gold in small quantities upon Anvil

creek, but made no locations and staked no claims, but soon returned to Chinik, and Blake, Kimber, Hagelin and Porter, so far as the record shows, never returned to Anvil creek. Nels O. Hultberg, on the 31st day of August, 1898, returned to the States, afterwards went to Sweden, and was not on Anvil creek until in the summer of 1899.

On September 11, 1898, John Brynteson, Japhet Linderberg and Eric O. Lindblom started on a second trip to Snake river and arrived at Anvil creek September 15, where they remained several days prospecting and locating and staking claims. That region at that time was a wild and unexplored country, and the party were unfamiliar with mining and the law governing the locating and staking of placer mining claims, except in a general way. They found gold in paying quantities on Anvil creek and staked a number of claims. They located, staked and named the claim where they first found gold on Anvil creek, as "Discovery," and then staked claims above and below that claim, the claims below Discovery on the creek being designated as claim "No. 1 Below," claim "No. 2 Below," etc., and those above Discovery on the creek as claim "No. 1 Above," claim "No. 2 Above," etc. The law governing the location of placer claims upon property belonging to the government provides that claims shall be 1320 by 660 feet. The parties had no method of making accurate measurements, but stepped the claims and located and staked them 1500 feet in length up and down the creek. There is no direct evidence in the record showing that on that trip claims were located or staked higher up on Anvil creek, above Discovery, than claim No. 6 Above.

The party returned to Chinik about the first of October, and on October 12 another party, consisting of Brynteson, Linderberg and Lindblom, who made the second trip, and G. W. Price, A. N. Kittelson and John Tornensis, started from Chinik to Snake river. Price was an expert miner who had arrived at Chinik about the first of October. Kittelson was in the employ of the government as superintendent of

reindeer, and Tornensis was a Laplander, also in the employ of the government. On the arrival of the party at Anvil creek they organized a mining district, and the claims which had been located and staked when the party was there in September were re-located and re-staked under the direction of Price. They started, as before, with Discovery, which was reduced in length from 1500 to 1320 feet, and located and staked a number of claims below Discovery and twelve claims above Discovery. The claims, as re-located and re-staked, were reduced in length and were measured and staked 1320 feet up and down Anvil creek and 660 feet in width. The claims, up to and including No. 6 Above, were re-located and re-staked in the names of the parties who had located and staked them at the time the second party visited Anvil creek, and No. 7 Above was located and staked in the name of Kittelson, No. 8 Above in the name of G. W. Price, and No. 9 Above in the name of R. L. Price by G. W. Price, as attorney in fact of R. L. Price.

The only evidence before the arbitrators as to what was done on the second trip to Anvil creek in the way of locating and staking claims was the testimony of Price and Kittelson, who were examined as witnesses before the arbitrators, and the deposition of John Brynteson, which had been taken in another case, which, by agreement, was read in evidence before the arbitrators. The witness John Brynteson, in his deposition, referred to the location of no claim when the second party was at Anvil creek, above claim No. 6 Above, although he testified fully as to what was done by the party at that time, and Price and Kittelson both testified that when they went upon the ground in October they found the stakes standing showing the location and staking of claims No. 1, No. 2, No. 3, No. 4, No. 5 and No. 6 Above, but they found no stakes or other evidence of the location or staking of claims on Anvil creek above No. 6 Above, and that they had never heard, until after their return to Chinik, that any claims had been staked upon Anvil creek above No. 6 Above by the sec-

ond party which went from Chinik to Anvil creek. The records of the mining district were offered in evidence, and they showed that claims Nos. 1, 2, 3, 4, 5 and 6 Above on Anvil creek were located at the time the second party was on Anvil creek, and that claims Nos. 7, 8 and 9 Above were located at the time the third party was on Anvil creek, and at that time there was and could have been no reason for falsifying the records as to the date of the location and staking of said claims. The only evidence before the arbitrators to impress a trust upon No. 9 Above were certain alleged admissions of Peter H. Anderson, testified to have been made by him many months after the purchase of claim No. 9 Above from Price. These admissions were claimed to have been made by Peter H. Anderson in casual conversations, at different times and places, with persons in no way interested in claim No. 9 Above, except those testified to by Nels O. Hultberg, who claimed to have some interest therein as the agent of the covenant, some of the parties testifying Peter H. Anderson said to them he held claim No. 9 Above in trust for Gabriel and Constantine, two Eskimo boys who were inmates of the mission at Chinik, others that he said he held claim No. 9 Above in trust for the covenant, and others that he said he held claim No. 9 Above in trust for the Eskimo boys and the covenant. Peter H. Anderson denied that he had ever stated to anyone that he held said claim No. 9 Above for the benefit of Gabriel and Constantine, or for the covenant, or for the Eskimo boys and the covenant.

It appears that the Statute of Frauds is in force in the territory of Alaska. It is therefore clear that an express trust was not established in said claim No. 9 Above as against Peter H. Anderson and in favor of the covenant. An express trust in land cannot be established by proof of the oral admissions of the party sought to be charged as trustee. An express trust, as against the Statute of Frauds, cannot be established by parol proof. *Dick* v. *Dick,* 172 Ill. 578; *Godschalk* v. *Fulmer,* 176 id. 64.

It is, however, argued, that if the evidence does not establish an express trust it shows a resulting trust. The evidence introduced before the arbitrators showed that Nels O. Hultberg and Peter H. Anderson were not paid a salary for their services as missionaries at Chinik, but that Nels O. Hultberg and wife received $1000 per year and Peter H. Anderson $700 per year, in merchandise, for their salaries from the covenant. Hultberg and Anderson both agree that this amount of merchandise, when delivered to them, respectively, became their individual property. When the party which located claim No. 9 Above left Chinik for the Snake river they went in a boat which belonged to the mission, and which was in charge of the Eskimo boy, Constantine. Price, Kittelson and Anderson all agree in testifying that the use of the boat was paid for by the party who went on the third trip constructing for the mission a school house, and they all agree that the provisions which the party took with them belonged to the individual members of the party, and that nothing used by the party on the trip was furnished by the covenant or Hultberg. Kittelson testified he furnished one-half of the provisions used, from a stock of provisions which he had purchased otherwise than at the mission, and that Brynteson, Linderberg and Lindblom furnished provisions which they purchased from Dexter, a trader located near the mission, and Peter H. Anderson and Price and Kittelson testified Price paid his share of the expenses of the trip to Kittelson in cash, who adjusted the matter with the other parties, as Price had no provisions.

As the covenant furnished no part of the consideration used in the location and staking of claim No. 9 Above, a resulting trust was not impressed upon the mine or the gold taken therefrom by Peter H. Anderson. To create a resulting trust the money or property going into the land must have been paid before or at the time the title vested,—not afterwards. The trust must be created, if at all, at the very time the title to the property is acquired. Such trust cannot

be created by or arise out of a contract or agreement, and the use of funds or property in the payment for improvements or in developing the property after title has been acquired will not be considered as creating a resulting trust; (*Holmes* v. *Holmes,* 44 Ill. 168; *Sheldon* v. *Harding,* id. 68; *Donlin* v. *Bradley,* 119 id. 412; *Pain* v. *Farson,* 179 id. 185; *Moore* v. *Hanserley,* 109 Cal. 122;) and the law is well settled that there can be no resulting trust between two or more persons unless the exact amount contributed by each is clearly shown,—that is, that each party contributed an aliquot part,—and the burden of proving the same is upon the beneficiary, and not upon the person sought to be charged as trustee; (*Perry* v. *McHenry,* 13 Ill. 227; *Heneke* v. *Floring,* 114 id. 554; *Stephenson* v. *McClintock,* 141 id. 604; *Strong* v. *Messinger,* 148 id. 431; *VanBuskirk* v. *VanBuskirk,* id. 9;) and the evidence to establish a resulting trust must be clear and satisfactory. In *Towle* v. *Wadsworth,* 147 Ill. 80, it was held that to establish a resulting trust the proof must be full, clear and satisfactory. And in *Devine* v. *Devine,* 180 Ill. 447, the evidence to establish a resulting trust must be certain, clear and cogent, and is always received with caution. And in *St. Patrick's Catholic Church of Sterling* v. *Daly,* 116 Ill. 76, that before a resulting trust can be established in land purchased by a priest, on the ground that it was purchased for the church and with funds that equitably belonged to the church, the application of such funds must be satisfactorily shown. The proof submitted to the arbitrators failed to establish that any of the funds, or any portion of the supplies used at the time of the discovery, location or staking of said claim No. 9 Above, were furnished by the covenant or by Nels O. Hultberg.

It is, however, urged, that if an express trust or a resulting trust was not established, a constructive trust was established by reason of the fact that Peter H. Anderson was a missionary and in the employ of the covenant at the time the mine was discovered, located and staked and conveyed to him,

and that by reason of the fiduciary relation which existed between Peter H. Anderson and the covenant the mine became the property of the covenant.   The evidence wholly failed to establish a constructive trust.   Peter H. Anderson was not sent to Alaska by the covenant for the purpose of discovering, locating, staking or operating gold mines, but to teach and christianize the Eskimos, and the covenant was organized, not for the purpose of engaging in the mining of gold, but to carry on christian mission work in the United States and foreign countries, spread the gospel and promote a christian association and religious life between the church organizations and members thereof, and to do general christian, charitable and educational work.   It was therefore powerless to engage in the business of mining gold.   A contract outside of the object of the creation of a corporation, as defined by the law of its creation, is wholly void and of no effect, (*Central Transportation Co.* v. *Pullman's Palace Car Co.* 139 U. S. 24; *People* v. *Pullman's Palace Car Co.* 175 Ill. 125;) and the sending of Peter H. Anderson to Alaska as a missionary did not create a fiduciary relation between Anderson and the covenant with reference to the subject of mining gold, as that business was entirely outside of his missionary work and outside of the object for which the covenant was organized.   It is only where an employee acquires an interest in the subject matter of his employment that his principal can treat him as a trustee.   (*Davis* v. *Hamlin,* 108 Ill. 39.)   The mining of gold and the teaching of the gospel to the Eskimos were wholly foreign to each other. Furthermore, if the trust attached at all, either as an express trust, a resulting trust or a constructive trust, it attached to the soil and to the gold therein, and not to the person of Peter H. Anderson; and even though the proof showed that the second party which went to Anvil creek located a claim for the benefit of the covenant, when the district was organized by the third party that went to Anvil creek the boundaries of the claims were so far changed, they being reduced

from 1500 feet to 1320 feet in length, that the claim known as "No. 9 Above," staked on October 18, 1898, was not and could not have been the same land that was covered by the original claim No. 9 Above, if such a claim was staked by the second party in September, 1898, for the covenant, in the names of Gabriel and Constantine, or otherwise.

For the reasons hereinbefore stated, we think it too clear for argument that the arbitrators erred in holding that Peter H. Anderson and his assigns held claim No. 9 Above, and the gold taken therefrom, in trust for the covenant.

The evidence introduced before the arbitrators shows that in 1899 it was demonstrated that claim No. 9 Above was a very rich placer mine, and soon thereafter the Eskimo boys, Gabriel and Constantine, as well as the covenant, claimed it had been staked out by Peter H. Anderson for their benefit, and Gabriel and Constantine commenced a suit against Peter H. Anderson to recover the mine and its proceeds, in a court of record in Alaska. The claim of Gabriel and Constantine was settled, and Peter H. Anderson paid to them or their representatives the sum of about $15,000 in cash, and obligated himself to pay them $25,000 in installments in addition thereto, and a decree was entered establishing the title to said claim No. 9 Above, as against them, in Peter H. Anderson. From the time Peter H. Anderson acquired said claim No. 9 Above, to the year 1901, he donated to the covenant something like $41,000 in cash. In the year 1901 Peter H. Anderson heard that members of the covenant were circulating reports to the effect that the covenant owned said claim No. 9 Above, and that Peter H. Anderson held said claim No. 9 Above, and its proceeds, in trust for the benefit of the covenant, and were threatening to bring suit against him to recover said claim and its proceeds. Peter H. Anderson repudiated said claim, but proposed to the covenant that he would donate $54,000 in cash, to be used by it in erecting a hospital and in furtherance of the other objects of its organization, if it would release all claim to said claim

No. 9 Above and its output, and after much correspondence with the officers of the covenant, and after full consideration, the covenant accepted said proposition, and Peter H. Anderson paid to the covenant $54,000 in cash, which it accepted and now retains, and its president and secretary executed and delivered to Peter H. Anderson a release of all claims which they had against him. This action was taken and the release was executed with the knowledge of the board of trustees of the covenant and approval of its general conference. Corporations organized not for pecuniary profit, as well as corporations organized for pecuniary profit, and all individuals, are bound by all contracts which they are authorized to make, which are supported by a good consideration and which are knowingly entered into, and a court of equity, which is a court of conscience, will not sanction the enforcement of a claim which has once been released upon a fair and full settlement, and if a release of a cause of action has been procured by fraud, the party releasing the same must, within a reasonable time after the discovery of the fraud, return the consideration received in settlement of the claim and repudiate the settlement, or he will be deemed to have ratified the settlement.

It is, however, said, that Peter H. Anderson only paid to the covenant its own money, and if he was credited by the arbitrators with the amount of said payment in the adjustment of his account with the covenant he has no reason to complain. The rule thus contended for might have some application here if Peter H. Anderson admitted he was a trustee, and held said claim No. 9 Above, and its proceeds, as trustee for the covenant. This, however, he does not admit and never has admitted, as he testified, and the doctrine contended for has no application to the facts disclosed by this record.

It also appears that Claes W. Johnson was fully informed as to the controversy between the covenant and Peter H. Anderson with reference to the ownership of claim No. 9

Above, and was also informed that the claim of the covenant against Anderson had been settled prior to the purchase of claim No. 9 Above by the White Star Mining Company of Illinois, of which he was president and in which he had invested his money. If the White Star Mining Company of Illinois and Johnson relied upon that settlement, as they had a right to do, in dealing with claim No. 9 Above, we think the covenant estopped, after said settlement, as against the White Star Mining Company of Illinois and Johnson, to claim ownership of said claim No. 9 Above, and as Nels O. Hultberg admits he paid the covenant nothing for the transfer of said claim No. 9 Above, and its proceeds, to him, and will hold for the benefit of the covenant whatever he gets out of claim No. 9 Above, and the gold taken therefrom, after he is re-paid for financing this litigation, he stands in no better situation than the covenant.

In the hearing before the arbitrators, the attorney for Peter H. Anderson, Claes W. Johnson and the White Star Mining Company of Illinois asked the arbitrators to first ascertain and pass upon the question whether Nels O. Hultberg had any claim to claim No. 9 Above, and if it was held he had a claim to the mine, to then proceed to state the account between the parties. The arbitrators did not rule upon the question fully, but stated to the attorney for Anderson, Johnson and the White Star Mining Company that he should not be cut off from a full and fair accounting, but held that Peter H. Anderson and Claes W. Johnson should state at that time, in round numbers, the net receipts of the mine for the several years in which they had, respectively, been in possession thereof. This they proceeded to do, whereupon the arbitrators found claim No. 9 Above to be the property of Nels O. Hultberg, and then, upon the evidence before them, fixed the amounts Peter H. Anderson and the White Star Mining Company, as his assignee, should pay Nels O. Hultberg without any further information upon which to base an account than the statements of Peter H. Anderson

and Claes W. Johnson of the net receipts of the mine for the years in which it had been in the possession of Anderson and the White Star Mining Company of Illinois. Three reasons are given in defense of this action of the arbitrators by the attorneys for Hultberg and the covenant: First, that the arbitrators took Anderson and Johnson at their word; second, that the time in which the arbitrators were to make their award was limited and that they did not have time to go into a full accounting; and third, if they had announced their holding that the claim belonged to Nels O. Hultberg, Anderson and Johnson and appellant would then have withdrawn from the submission, and they would have been powerless to make an award. We are not impressed with the soundness of these reasons. This mine had been operated by said parties for a number of years, and the covenant had received from the proceeds thereof, in donations or otherwise, $95,-000, which was a large return, according to its own view, on the few hundred dollars' worth of provisions that it furnished Peter H. Anderson as a missionary while he was engaged with it in Alaska, and to hold that the mining property and its proceeds should be taken from Anderson and his assignees without allowing him or them something for their services in developing and operating the mine during those years, at least seems harsh and inequitable, and we are impressed with the conviction that from the manner in which the account was stated, Anderson and Johnson and the appellant were greatly surprised, and that the result, even though it were conceded the mine and its proceeds belonged to Nels O. Hultberg, reached by the arbitrators worked a great injustice to the appellant and Anderson and Johnson, and in law amounted to a fraud upon them.